No. 32,806

CLARA ESPEY, *Appellee,* v. THE STATE HIGHWAY COMMISSION OF
THE STATE OF KANSAS, *Appellant.*

(57 P. 2d 424)

Opinion filed May 9, 1936.

*Wint Smith, Edward F. Arn,* both of Topeka, and *Howard T. Fleeson,* of Wichita, for the appellant.

*Henry Lampl, Maurice Lampl,* and *Rupert Teall,* all of Wichita, for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This was an action for damages for wrongful death resulting from alleged defects in a state highway. Defendant appeals.

The accident occurred on U. S. highway No. 54, a sand-and-gravel road, at a point about twelve miles west of Kingman, Kan., and at about 8:45 o'clock in the morning of August 12, 1934. The highway runs east and west. Deceased was driving a truck in a westerly direction. His wife accompanied him on the trip. The truck passed over the alleged defects and struck a bridge, resulting in the driver's death. The jury made answer to certain special questions, which are:

"1. (a) Was there a defect in the highway at the time and place of deceased's accident? A. Yes. (b) If your answer is 'yes,' then state the location thereof. A. About one hundred and forty (140) feet east of east end of the bridge.

"2. If you answered question 1 in the affirmative, then describe said defect by stating: (a) The depth? A. About four (4) inches. (b) The length? A. About six (6) feet. (c) The width? A. About five (5) feet.

"3. If you have answered question 1 in the affirmative, then state whether the director of highways, or state highway engineer, or any member of the

state highway commission, or any foreman, patrolman or other employee in charge of the construction, maintenance or upkeep of such highway had notice of the existence of such defect. A. Yes.

"4. If you have answered question 3 in the affirmative, then state: (a) His name. A. Earl Parsons. (b) On what date or for how long prior to August 12, 1934, he had such notice. A. At least five (5) days.

"5. Was the deceased at the time of the accident and immediately prior thereto exercising due care for his own safety? A. No.

"6. If you answer question 5 in the negative, then do you find that the accident and resulting injury was caused by his failure to exercise due care? A. Yes.

"7. How far east from the defect described in question 2 could the deceased have seen said defect on the morning of the accident by keeping a proper lookout over the roadway ahead of him? A. About one hundred (100) feet."

The jury returned a verdict in favor of plaintiff and assessed the recovery at $1. Defendant moved for judgment notwithstanding the general verdict, for the reason it was entitled to judgment on the special findings of the jury. Plaintiff moved to set aside special findings 5, 6 and 7, upon the ground they were contrary to all the evidence, not supported by any evidence, were in conflict with all of the evidence, and inconsistent with the other special findings. Plaintiff also moved for a new trial. The court overruled defendant's motion, disapproved special findings 5, 6 and 7, set the same aside, set aside the general verdict and sustained plaintiff's motion for a new trial. Defendant had demurred to plaintiff's evidence. The demurrer was overruled. Defendant appeals from that and all other adverse rulings.

On the demurrer to the evidence two questions are presented: Did the chuckholes or whipped-out places on the sand-and-gravel road constitute defects within the meaning of R. S. 1933 Supp. 68-419? If so, did defendant have five days' notice thereof? The pertinent evidence of plaintiff on the subject of defects disclosed substantially the following facts:

There existed to the east of the bridge a grade or rise. The top of the rise was about one fourth mile east of the bridge. The decline toward the bridge was gradual. The road was practically level for some distance east of the bridge. The extent of the level portion, according to various witnesses, will be narrated directly. The accident occurred on this practically level portion of the highway. The complaint is concerning two chuckholes or whipped-out places. The larger place was located between 75 and 150 feet east of the bridge. It was described as being from three to five inches deep, and then containing about two inches of loose sand, gravel and dirt. The

testimony as to width and length most favorable to plaintiff was it was about four to five feet wide and about eight to nine feet long. The other alleged defect was about 50 feet east of the bridge, about three inches deep, about three feet wide and about three or four feet long. Both chuckholes were a little north of center or on the right side of center to a vehicle traveling west. The weather had been extremely dry. The accident occurred on Sunday morning, August 12. August was in the midst of the drought. The highway was covered with loose sand, gravel and dust. The entire portion of this gravel road, which was nine to twelve miles in length, was generally rough, but there were also good places upon it.

We shall now narrate pertinent testimony particularly concerning the extent of the level portion of the highway on which the accident occurred, such evidence as the record discloses concerning the nature of the grade and the distance of the chuckholes from the top of the rise. The witness Luce, a mailcarrier, who traveled this road, testified substantially as follows: "I travel this highway going east. That puts me on the south side of the highway. The road was rougher there (meaning the east side), than on the west side of the bridge. I mean, it was rougher in this level spot in the bottom. The level place is 100 yards, maybe a little more. The grade from the bridge east began about 200 feet or possibly a little more. It may rise just a small amount from the bridge, but it is practically level for 200 feet or more. I hardly know how to say just what percent grade it would be. It is not a very high hill; it is a long, sloping hill." He traveled on that road Saturday night, the day before the accident on Sunday morning. He noticed the chuckhole. He drove through it on his way home that night. He had been driving faster on his way home, but slowed up to approximately thirty to forty miles an hour. At that speed he drove right through the chuckholes, with the left wheels. He stated he knew the road was rough down there, but didn't prepare for this particular chuckhole.

The witness Fall, a brother-in-law of Mrs. Espey, the plaintiff, testified in substance: The road is downgrade before it strikes the bridge, for approximately 300 or 400 feet. East of the bridge it is fairly level. Right at the bridge it was level, then it goes up hill. It was level for about 300 yards, then the road starts on an upgrade and goes up to the east for approximately a quarter of a mile.

The witness Lawson, a farmer who lived about 300 yards east

of where the accident occurred, testified in substance: He heard the crash and went right down there. There was a chuckhole about 150 feet east of the bridge. It was three or four feet wide, six or eight feet long and three or four inches deep. At the bottom was some sand—loose stuff—dirt. "Q. And you did not observe any other depressions between the depression that you describe and the bridge? A. Nothing to speak of, that I remember." It was approximately a quarter of a mile from the bridge to the top of the rise. The roadway was practically level. "I believe the hill starts up to the east back east of this depression. I can't say just how far east of the chuckhole the grade starts up toward the east."

The witness Morris, who was employed by the deceased as a truck driver, testified concerning the level portion: The grade sloped up to the east, began something like 100 yards east of the bridge. It is something like 200 feet from the depression to the beginning of the hill as it goes up to the east.

The witness Gibbons, a farmer who lived about 200 yards east of the bridge and on the north side of this highway, testified: There is about 100 yards of level road on each side of this bridge—it is very nearly level. The chuckhole was a little north of center. It was about three or four feet across. It looked like it was almost as wide as it was long. It was three or four inches deep. It was sand and loose dirt in the chuckhole. That was a sandy highway.

Clara Espey, plaintiff, wife of the deceased, testified in substance: "It must have been 100 feet east of the bridge where the truck struck the first hole. The truck struck the second hole about thirty feet east of the bridge. I don't just remember. All I remember is the jar. We were driving along at a moderate rate of speed, and all of a sudden it seemed like the whole front end fell into a big ditch, at the left side. The brakes worked perfectly before that time. The brakes did not work after he struck the hole—the most I can remember—he tried to put on the brakes and he tried to use the steering wheel to keep it from going into the ditch. He was apparently not able to control the car with the steering wheel after he struck the hole. From the time he struck the hole until he crashed into the bridge he apparently could not control the car in the matter of direction or speed or stopping."

While various decisions are cited, plaintiff is of the opinion the case is governed by the decisions in *Williams v. State Highway Comm.*, 134 Kan. 810, 8 P. 2d 946, and *Cheney v. State Highway*

*Comm.,* 142 Kan. 149, 45 P. 2d 864. Defendant asserts it is controlled by the decision in *Douglas v. State Highway Comm.,* 142 Kan. 222, 46 P. 2d 890. In the Douglas case this court said:

"In the consideration of the ruling on the demurrer to the evidence of the plaintiff the first question that arises is, whether the existence of a defect in the highway under the statute is a question of fact for a jury or a question of law to be determined by the court. Generally speaking, such a question is one of fact for the jury, but this being purely a statutory liability, the question of whether the alleged defect comes within the purview of the statute is a question of law. (*Gorges v. State Highway Comm.,* 135 Kan. 371, 10 P. 2d 834; *Snyder v. State Highway Comm.,* 139 Kan. 150, 30 P. 2d 102; and *Hanna v. State Highway Comm.,* 141 Kan. 135, 40 P. 2d 472.)" (p. 222.)

A sand-and-gravel highway was involved in the Williams case. In the Douglas case the composition was gravel or chat. The Cheney case involved a bituminous mat which was corrugated and washboardy. In the Williams case there were two holes, *near the top of the hill,* one four inches, the other five inches in depth. In the Williams case it was said:

"Here there is evidence that the driver in descending the hill could not see the holes until he was practically upon them." (p. 815.)

In the Cheney case the accident happened at night. The bituminous mat was corrugated and washboardy. The places were one to four inches deep and extended fifteen to twenty feet north and south. The corrugations were one to three feet apart. They were on the *north slope of a small hill. It was impossible for one coming from the south to see them more than fifty feet after reaching the top of the hill.* The jury found the driver exercised the care and caution that would have been exercised by an ordinarily careful and prudent driver under the same or similar circumstances.

It clearly appears in the instant case the alleged defects were not directly over the top of a hill. The accident occurred on a practically level portion of the highway, about 75 to 150 feet east of the bridge. The decline from the top of the grade or rise was gradual and the top of that grade was about one fourth mile east of the bridge. Clearly this was not a concealed defect nor one which suddenly appeared over the crown of a hill when the driver was practically upon it. Plaintiff's witness Morris stated he drove west over this road on Saturday before the Sunday on which Mr. Espey was killed. On direct examination he testified he observed the first hole just when he broke over the hill, a little back. On direct examination he was asked and answered as follows:

"Q. In answer to counsel's question as to when you first saw the hole I will ask you if you did not say this: 'I saw the first hole just as I broke over the hill'? A. No. I didn't say that.

"Q. So you want to say now that it was as you neared the bottom of this hill that you first noticed those places? A. When I got nearer—nearer the big hole, I saw it—see? But I didn't from the brow of the hill.

"Q. You say now it was when you got down to the bottom of the hill? A. Yes, that is what I mean.

"Q. And the bottom of the hill was, as you state, roughly 200 feet from the hole, approximately? A. Yes."

Giving this testimony its most favorable construction, it is clear the alleged defects were not just over the crown of the hill, where they could not be observed, but on the contrary were a long distance from the top of the rise, and the witness observed them 200 feet before he reached them. This same witness also testified as follows:

"Q. And as you drove down over that hill, Mr. Morris, as you came down near the bottom of it you could see the roadway ahead of you and determine that it was rough? A. No, you couldn't. You—that is where they had dragged it in over there—those roads you couldn't tell it was rough until you got right onto it."

It will be observed the last answer is not responsive to the question concerning this particular alleged defect, but is descriptive of roads where the chuckholes had been filled in with a drag. That is not the complaint nor the evidence of plaintiff as to this particular alleged defect on this distinct occasion. The very evidence relied upon here is the chuckhole had not been filled and there was a depression of three to five inches in depth. As to this particular alleged defect, however, the witness testified that he could observe it approximately 200 feet away. Plaintiff's witness Lawson testified:

"Coming down the grade toward the hole in broad daylight you could see it if you were looking for that kind of a place, I presume you could, but if you weren't looking for it why you could overlook it until you got pretty close to it."

This accident occurred in broad daylight. It happened on the level portion of the highway. There was nothing to obstruct the view. Ignoring, for the moment, the evidence of the long gradual slope to the level portion of the road, the evidence most favorable to plaintiff was the chuckhole could be observed from a distance of 200 feet.

In the Douglas case this court carefully reviewed its various decisions on the subject of defects in highways, including the Wil-

liams and Cheney cases, strongly relied on by plaintiff in the instant case, and pertinently said:

"It will be observed in nearly all of the cases thus far cited herein the defects were obscured from the view of the driver in one way or another, either by standing water or weeds at the side of the road or the chuckholes or washboardy effect being just over the top of a hill." (p. 228.)

In conclusion, it was further said:

"It seems from the testimony of plaintiff's witnesses that the corrugated or washboardy effect, chuckholes and ruts described in this case may have been a little worse than just the common, ordinary graveled-road condition in wet weather, but certainly not enough different from what most of them describe as usual and ordinary to make its condition a defect under the meaning of the statute, unless we say that any and every gravel or chat road is defective and dangerous to the traveling public in wet weather, in level places and where it can ordinarily be seen." (p. 229.)

In the instant case there had been a long drought. Truck traffic was heavy on this highway. The gravel and sand were easily whipped out of the roadbed. Chuckholes or whipped-out places were the natural result. They were in this highway, notwithstanding the fact the maintainer was perhaps used four or five times a week. Assuming without deciding the conditions in this road would constitute a defect if they existed on one of the highest class roads, such as a concrete road, it does not follow they are defects on an ordinary dirt or sand-and-gravel road. The primary purpose of the latter type of road was simply to provide an all-weather road. In other words, the intention was to get the traveler out of the mud. In that regard and for that purpose it is an advancement. It, however, also has distinct disadvantages. Heavy traffic wears the surface unevenly. The binding character of the material is not of sufficiently high quality to cause its various particles to adhere. It is highly sensitive to the elements. Heavy rains or protracted dry spells affect the surface materially. Chuckholes are common. These are conditions which inhere in this cheap class of road construction. These conditions are commonly known and recognized by the traveling public. Can it then be said they are defects? We think not under the circumstances disclosed in this record.

There was evidence the larger chuckhole was filled Sunday afternoon, the day of the accident. That fact does not establish a defect.

In view of the conclusion reached it is unnecessary to treat the subject of notice. In passing, however, we may say after careful analysis of the record, we find no proof the road was in the same or

worse condition five days prior to the accident. That being true, there could have been no notice of a defect. The demurrer should be sustained. It is so ordered.